LUND v. HOWELL et al.

No. 5747.   Decided April 13, 1937.   (67 P. [2d] 215.)

*Budge & Parker,* of Salt Lake City, for appellant.

*O. W. Carlson,* of Salt Lake City, for respondents.

LARSON, Justice.

This is an appeal from a judgment of the district court of Salt Lake county upholding and refusing to cancel, annul, and set aside an assignment of an undivided interest in an

estate, as a fraud upon creditors of the assignor. The facts are simple. In 1913, Ezra J. Howell, a widower, whose home was at Fish Haven, Bear Lake county, Idaho, married defendant Nellie B. Howell, and they built a house in Salt Lake City, where defendant Nellie B. Howell lived much of the time since. Mr. Howell owned some land, sheep, and cattle in Idaho, and kept his legal residence there. About 1919 the record title to the home in Salt Lake City passed to defendant Nellie B. Howell. In 1928, the Shepherd interests of Idaho obtained two judgments in the courts of that state against Ezra J. Howell in the aggregate sum of $4,881.66. The Shepherd judgments have not been paid, and on April 19, 1929, were by the judgment creditor assigned to Henry J. Howell, a brother of Ezra. Henry J. Howell, on June 30, 1934, assigned said judgments to his son, Ernest Howell. On June 9, 1930, Emmett J. Howell died in Salt Lake City, leaving surviving as his heirs at law, six brothers and sisters, among whom were Ezra J. Howell and Henry J. Howell, and on September 4, 1930, Ezra J. Howell, in writing duly acknowledged before a notary public, assigned to defendant Nellie B. Howell, all his interest in the estate of Emmett J. Howell. In August, 1931, partial distribution was had in the Emmett J. Howell estate and $2,000 distributed to Nellie B. Howell, and $1,000 distributed to her in July, 1933, on a second partial distribution. On May 26, 1934, Nellie B. Howell in writing assigned to defendant David J. Davis all her interest in the Emmett J. Howell estate. Ezra J. Howell died in Idaho on May 14, 1934, being a resident of Bear Lake county, Idaho. One, Dr. Moore, was appointed administrator of his estate in Idaho, and in September, 1934, plaintiff was appointed administrator of the estate of Ezra J. Howell in Utah. The administrator has found no property in the name of Ezra J. Howell in Utah. The above matters are shown either by public records or documentary evidence and are not in dispute.

Plaintiff instituted this action to set aside, void, and cancel the assignments from Ezra J. Howell to Nellie B. Howell,

and from Nellie B. Howell to David J. Davis, of the interest in the estate of Emmett J. Howell, which vested in Ezra J. Howell upon the death of Emmett, and subject such interest to the payment of the Shepherd judgment.

A companion case, 92 Utah 250, 67 P. (2d) 223, was brought by plaintiff herein against Nellie B. Howell, alone, to recover the $3,000 she had received on partial distributions from Emmett's estate. Plaintiff contended that such assignments were without consideration, and were made to hinder and defraud the creditors of Ezra J. Howell. The trial court held that the assignments were made for fair value and consideration, in good faith, and not to hinder or defraud creditors, and denied plaintiff relief. The challenge of the plaintiff to these holdings presents the only question on this appeal.

There is no dispute between counsel as to the rules of law which govern these situations. The question is: Does the evidence support and sustain these findings of the trial court? In an analysis of the evidence we will find the answer.

The defendant Nellie B. Howell called as a witness by plaintiff testified: That at the time of her marriage she had about $5,000 of her own money; that $4,000 was put into the house built in Salt Lake City, and the other $1,000 loaned or advanced to Mr. Howell for use in his live stock business, in two $500 loans (April and June) to be repaid in the fall at 7 per cent.; no notes were taken; that in 1921, 1922, and 1923 she advanced to Mr. Howell, and paid bills for him, in the sum of $3,500 evidenced by a series of bank checks signed by Nellie B. Howell, and put in evidence; that this money was derived from a mortgage placed on her home, $3,000 of which was still outstanding, and that during 1925 she further loaned or advanced to Mr. Howell another $1,300, making total advancements of $5,800; that Mr. Howell always promised to repay these amounts with interest on the $3,500, and the $1,300 at 6 per cent. (there are no documents or written evidence of the loans in 1913 or 1925) ; that after

Emmett Howell's death Ezra offered to, and did give her an assignment of his interest in Emmett's estate, the assignment being made and signed in the office of O. W. Carlson, attorney for the Emmett Howell estate, and acknowledged before J. Grant Iverson, an attorney and notary. A copy of the assignment was given the same day to Dr. Neher, the administrator. That two partial distributions were had in the Emmett Howell estate, checks for $2,000 and $1,000 being made to Ezra J. Howell, and indorsed over to her. That after the death of her husband she was in need of money, so sold and assigned to David J. Davis for $150 the remaining interest she had in the Emmett Howell estate; that she estimated such interest to be worth, perhaps, $300 to $350; that she did not know that Ezra Howell, during his lifetime, was unable to pay his bills; that though he needed money at times, and borrowed some, his business was carrying on; that she did not know of the Shepherd judgments until after Howell's death, though she knew at times he had run an account with them; that some of the money she advanced to Mr. Howell was put into the business by him to enlarge it; that some was used to buy sheep and rams as shown by notations on the checks in evidence, and some to pay some notes of her husband as also shown by notations on the checks; that about the time of the assignment to her they had 4,000 sheep clear of encumbrance which were later mortgaged by Howell to the Kemmerer Bank, and foreclosed after his death; that Howell was not insolvent or unable to pay his debts in due course of business until 1932 or 1933, if at all.

David J. Davis testified that in 1934 Mrs. Howell sold and assigned to him her interest in the Emmett J. Howell estate for $160; that he paid $10 cash and a check for $150 drawn by Loraine Bagley of Salt Lake City; that he knew the Emmett Howell estate was mostly stocks, but did not know what the interest was worth.

This is substantially all the evidence pertaining to the assignments. The administrator's report in the Emmett Howell estate filed in December, 1934, after the assignment to

Davis, shows the balance on hand to be about $8,253 represented by stock of various kinds, the values of which were estimated by the administrator. The record does not disclose if there were any outstanding debts or what the probable further expenses of administration would be. It does show that from time to time there were assessments to be paid on some of the stocks. There were six heirs at law to share the remainder whenever distribution should be had.

Appellant assails the testimony with respect to the assignments, not by evidence from other witnesses, but upon claimed uncertainties and evasions in the testimony of Mrs. Howell, which he claims throws doubt upon the narration of the events noted above. There is no proof that Howell was insolvent except the existence of the Shepherd judgments unpaid, and the plaintiff's declaration that he had not been able to find any property in Utah in the name of Ezra J. Howell.

Appellant's position is stated in these propositions: A conveyance by a husband to his wife of all his property is fraudulent against creditors even though she does not participate in the fraud and no actual fraud need be shown; an assignment giving preference indicates fraudulent intent, and such intent voids the assignments as against creditors; where a conveyance showing nominal consideration leaves a debtor unable to pay his debts, the burden is upon the grantee to show sufficient consideration and good faith; and where a conveyance is to a near relative, in a creditor's suit, the burden of showing good faith is on the grantee. As legal postulates, these statements may be accepted, but the question is: What force and effect is to be given to the evidence as noted above? Did Mrs. Howell sustain the burden of showing good faith and sufficient consideration for this assignment? She satisfied the trial court on both questions. Since this is an equity case and we may weigh the evidence and pass upon it, we have painstakingly gone over the transcript in the light of appellant's argument, and we also must conclude that Mrs.

Howell sustained her burden of showing good faith and fair consideration. This is not a situation like the case of *Paxton* v. *Paxton*, 80 Utah 540, 15 P. (2d) 1051, where all the testimony was merely the oral testimony of the parties to the transaction. At least $3,500 advanced in 1921, 1922, and 1923 are shown by documentary evidence. The checks themselves are in evidence, signed by Nellie B. Howell, and many of them containing corner notations such as "Part payment on fifteen rams" (for $210) ; another for $150 marked "for lambs"; another for $720 marked "to cover note." Others are identified in the evidence as payments for sheep; for hay, and other matters. All seem to be drawn in favor of people in and about Bear Lake county where Howell did his business. This was the money received from the mortgage on Mrs. Howell's home. As to this sum there is supplied in definite documentary evidence the very proofs the court demanded, and noted as missing in the Paxton Case, supra. Were we to disregard the items of $1,000 claimed in 1913, and of $1,300 in 1925, this item of $3,500 with interest at 6 per cent. would amount, at the time of the assignment to Mrs. Howell, to the sum of $5,180 or $1,000 more than the record indicates could possibly be realized upon the assignment to Mrs. Howell. Without further comment, we think the evidence sustains the finding of the trial court.

Since the assignment from Ezra J. Howell to Nellie B. Howell is valid and effective, of course appellant is in no position to question the validity of the second assignment from Mrs. Howell to Davis. We remark, however, that we think the evidence amply sustains the findings of the trial court that this assignment also was made in good faith, for sufficient consideration, and not to hinder or defraud creditors.

Appellant contends that the trial court erred in one of its conclusions of law, "The claim of plaintiff herein was barred by sections 6607 and 6611, Idaho Compiled Statutes

1919." The court does not find as a fact that the action is barred by limitations, but does include the quotation above in the conclusions of law. It can make no difference in the instant case whether the court was right or wrong in this conclusion, because since the assignments are valid the judgment must be affirmed regardless of the view that may be taken upon the question of limitations.

The judgment of the district court of Salt Lake county is affirmed. Costs to respondent.

FOLLAND, C. J., and HANSON and MOFFAT, JJ., concur.

WOLFE, Justice.

I dissent. I am unable to see how either Nellie B. Howell or David J. Davis has sustained the burden of showing by clear and satisfactory evidence that they took the assignments of the interest in the Emmett J. Howell estate by a fair consideration, as that term is used in section 33-1-4, R. S. 1933. The first was the wife of the original assignor of the interest and the second a brother-in-law of Mrs. Howell.

In *Paxton* v. *Paxton*, 80 Utah 540, 15 P. (2d) 1051, we held, as stated in the syllabi, that:

"In creditor's suit attacking conveyance or mortgage to near relative as fraudulent, defendant has burden of showing good faith of transaction."

The court in that case further says:

"It is quite generally held that a transfer or mortgage of property between near relatives which is calculated to prevent a creditor from realizing on his claim against one of such relatives is subject to rigid scrutiny. 27 C. J. 495, and cases there cited. Under the rule, a transfer or mortgage of property made to a near relative in consideration of past-due indebtedness will be sustained if attacked in a creditor's suit when, and only when, it is shown the debt is genuine, that the purpose of the grantee or mortgagee is honest, and that he acted in good faith in obtaining his title or lien. The burden, in such case, is

cast upon the grantee or mortgagee to show the good faith of the transaction by clear and satisfactory evidence. * * * Although the transactions concerning the alleged indebtedness of Anthony to Frank extended from 1894 to the commencement of these suits in June and July, 1927, there is no documentary evidence other than the note and mortgage here involved which supports, or tends to support, the claim that Anthony was indebted to Frank."

In *Frank* v. *Humphrey,* 121 Ill. 250, 12 N. E. 720, 722, it is stated:

"* * * where the husband undertakes to prefer his wife to the exclusion of other creditors, the proof should be clear and satisfactory that the wife has a valid subsisting debt, one which is to be enforced, and payment exacted, regardless of the fortune or misfortune of the husband. Such was not the character of this debt."

In *Kanawha Valley Bank* v. *Atkinson,* 32 W. Va. 203, 9 S. E. 175, at page 178, 25 Am. St. Rep. 806, the court stated:

"To the general proposition that if a clearly valid, subsisting debt in favor of a wife were fully proven, he might pay it, or prefer in payment of it to pay another for conveyance to her of property in discharge of his indebtedness to her, I would accede. But it is to be noted that, under the rule above extracted from Wells, a loan, a distinctive loan, as distinguished from a gift, must be established. In the Rhode Island case [*Steadman* v. *Wilbur,* 7 R. I. 481], which is as liberal as any towards the wife in this matter, it is held that 'the law will not, from the mere delivery by her of her money to him, or from the permitted receipt by him of her separate income, imply a promise by him to repay her, but will require more,—either an express promise or circumstances to prove that in such matter they dealt with each other as debtor and creditor.' The chief justice, in delivering the opinion in that case, says: 'She cannot, when her husband becomes insolvent, convert into debts, as against his creditors, former deliveries to him of her money or other property, or permitted receipts by him of the income or proceeds of sale of her separate estate, which at the time of such delivery or receipt were intended by her as gifts, to assist him in his business, or to pay their common expenses of living; and, considering the relation between them, the law would not, merely from such delivery or receipt, imply a promise on his part to repay or replace, as in cases not thus related, but would require more, either

in express promise or circumstances, to prove that in these matters they had dealt with each other as debtor and creditor.' So held, also, in *Edelen* v. *Edelen*, 11 Md. 415. It would be exceedingly dangerous to the business world to have a loose principle in this matter, and would open a wide door for the defeat of honest creditors. A husband and wife embark on the voyage of life together, expecting to meet the waves together, devoting to the support of themselves and children, and to his success, their common efforts and their several means. She is always willing, from affection for her husband and interest in his success, to extend him the help of her means, his business interests being in a large sense her interests, she never expecting any return of the means she commits to his hands; and if, after he has had those means employed in his business for years, mingled indiscriminately with his, it were permitted her, when misfortune overtakes him, to raise up loans to the prejudice of his creditors, and support them by his own and her evidence, after creditors had trusted him in total ignorance of such loans, and allow him to use his means in purchasing real estate in her name, a wide road would be laid out for the promotion of wrong against honest creditors. Better that there should be individual cases of hardship than that such dangers should stand in the way of the business world. If any one must suffer, better that even the helpless woman suffer than honest creditors whose means or property were perhaps consumed in furnishing shelter, food, and raiment to the wife and her children."

*Bast* v. *Bast*, 68 Mont. 69, 217 P. 345; *Roman* v. *Albert*, 81 Mont. 393, 264 P. 115; *Churchill & Alden Co.* v. *Ramsey*, 50 S. D. 73, 208 N. W. 406; *Carr* v. *Way*, 141 Iowa 245, 119 N. W. 700; *Cole* v. *Cole*, 231 Mo. 236, 132 S. W. 734; *First National Bank* v. *Herring*, 159 Ark. 317, 252 S. W. 37; *Bennett* v. *Bennett*, 37 W. Va. 396, 16 S. E. 638, 38 Am. St. Rep. 47; *Kuhn* v. *Stansfield*, 28 Md. 210, 92 Am. Dec. 681.

It does not seem to me that any one can read the testimony of Nellie B. Howell and conclude that she has met the burden of proving by clear and satisfactory evidence a debt owing from her husband which would support the assignment from her husband to her on September 4, 1930. It must be remembered that in this case the appellant was at the grave disadvantage of having to prove his case out of the mouths of adverse witnesses and in spite of that, I

think it was amply shown that advances by Nellie Howell to her husband alleged to have started as far back as 1913, after they were married, did not establish definitely enough the relationship of debtor and creditor between them to support this assignment as against creditors of the husband-assignor.

In the first place, her testimony is vague, evasive, general, and contradictory. As compared to the testimony she gave on her deposition taken by affidavit, it shows a distinct evidence of attempting to repair weak spots which that deposition—more spontaneous—revealed. There was evidence by her that she had advanced two sums of $500 each in 1913, and that he, Ezra J. Howell, said he would pay her back in the fall with 7 per cent interest. Such is the only testimony of any definite express promise to pay. There are some general statements that he had stated

"he would pay them back, the time would come when he would pay it. We didn't have any agreement as to dates. We made no notes. We had no note on it [interest to be paid]. Just a conversation in the home. Absolutely no agreement."

She testified again and again to this effect except as to the money advanced in 1913. She also repeatedly testified that the advances were made to aid him in his business. There was never any accounting between them. She never took a receipt for any of the money advanced. She never made a demand on him or at any time received any written statement or acknowledgment. Even the evidence that she advanced the moneys is unsatisfactory. As to the $1,000 in 1913, it depends solely on her own verbal statement. There are checks showing payments between 1921 and 1923, amounting to $3,597.75. But only $525 of these were to Ezra J. Howell. The rest were to other parties. She says they were for his business, but she, during that time, had sheep of her own which he ran with his. She says at one time she had sheep valued at $4,000 free of encumbrances. She also states that he tended to her sheep, sold them for

her, used the proceeds, and that he even mortgaged her sheep with his sheep for the business. She disclaims remembering any particulars about the business; says she left it up to him although in her deposition her knowledge of his business and his debts was not as vague as it was at the trial.

Her explanation of how she obtained the money she claims to have advanced him is unsatisfactory. As to $3,500 paid out in checks between 1921 and 1923, it seems fairly clear that that amount came from a mortgage on a home in Salt Lake City in her name, which she mortgaged for $3,500. But, as before stated, at that time she owned sheep. Two of the checks have notations that they are for lambs and rams. As to the $1,000 she claims to have advanced him in 1913, she says it was part of a sum of $5,000, the other $4,000 of which she put in the $9,000 Salt Lake home. She says she earned this sewing. As to the $1,300 claimed to have been advanced to him in 1925, she says it came from her father's estate, but when she was confronted with the fact that her father's estate had been distributed some years before, she said it came from her mother's estate. She says also she made some of it taking in boarders. It seems to me this is not "clear and satisfactory" evidence. I think the evidence rather clearly bears out her own testimony that she advanced these amounts to "build up the business. It was to build up the business and we were just within the peak."

The language of the case of *Moody* v. *Beggs,* 33 Idaho 535, 196 P. 306, is pertinent (from the syllabus) :

"A conveyance from the husband to the wife of all the husband's property, the consideration being a debt alleged to be due from the husband to the wife for moneys received from the wife, cannot be sustained against creditors at the time of such conveyance by evidence that the wife has turned over to her husband a large amount of her separate funds to be used by him in his business enterprises, when there is no showing of an agreement, either express or implied, that he would repay her."

In the course of the opinion in that case, the court says:

"It is not denied that the respondent, beginning about the year 1897, received probably $35,000 from her father and mother, and that a large proportion of this was turned over to the deceased, E. H. Beggs [her husband], to be used in various business enterprises by him. The question with regard to this transaction is whether these moneys were placed in the hands of the deceased in such a way as to create a debt and make them a sufficient consideration to support the transfer of this property from the deceased to the respondent.

"Naturally the respondent was the only one who had personal knowledge of the transactions between herself and her husband with regard to these funds, and her testimony falls far short of establishing such a claim as a creditor of her husband as will support the allegation of indebtedness which she relies upon in this case. There is no evidence that a note was taken or a memorandum of any kind made at the time the various sums of money were given by her to her husband, or at any time, and she is unable to tell, with any degree of certainty, what amounts she gave him, or when she gave them to him, or what he did with them. Neither does she relate anything that she said to her husband at the time of placing these moneys in his hands, or at any other time, indicating in the slightest degree that she regarded these advances as loans to be repaid by him, or that she ever expected him to account for them in any manner. Her statement is that when he asked her for money she handed it over to him, and that he always said he hoped some time to be able to repay her; but there is nothing in her testimony to indicate that she ever intimated to him that she regarded these payments to him as debts that he must pay. The whole transaction appears to have been one in which a wife was willing to give to her husband of her funds as long as they lasted and to take chances with him on whatever investment of them he chose to make. There is nothing to indicate that she ever thought of regarding her husband as her debtor until shortly before his death. Evidently she gave the money to him to be used as his own, with no thought of indebtedness and repayment, and he did so use it according to the testimony of Mrs. Beggs. If this was her intention, then there was no debt, and consequently no consideration for the deed in controversy."

True, in this case there was her statement of a definite promise in 1913 to repay in the fall and her statements that he would repay her some time. But until he made the assignment in Carlson's office on September 4, 1930, when she says he stated that it was to repay her for the thousands

of dollars he owed her, she did not consider herself a creditor. She testified when her husband mortgaged the sheep, she did not want anything more to do with them and said, "Goodbye." She did not want to discuss it. Long since that time she had ceased, she says, to pay any attention to his business. In fact, as stated in *Kanawha Valley Bank* v. *Atkinson,* supra, they embarked

"on the voyage of life together, expecting to meet the waves together, devoting to the support of themselves and children, and to his success, their common efforts and their several means."

This assignment was, to my mind, made when he knew he was in financial straits, to place the property beyond his advancing creditors. Then were converted into a debt, advances which they both had long since discontinued to regard, if ever they did so regard them, as loans.

I fear we are lending encouragement to the wife-refuge racket. In the cases of *Smith* v. *Edwards,* 81 Utah 244, 17 P. (2d) 264, and *Williams* v. *Peterson,* 86 Utah 526, 46 P. (2d) 674, we have given much encouragement to this practice. And the looser are the business dealings between husband and wife and the foggier their memories, the better it seems they can "get away with it." I think we struck the right tact in *Paxton* v. *Paxton,* 80 Utah 540, 15 P. (2d) 1051, and I think, for the sake of good morals and sound law, we should adhere to it. The fact that the judgment which was allowed by the administrator, plaintiff in this suit, was a stale one and came into the hands of Emmett Howell, a nephew, after lying dormant some years, may arouse suspicion that there is a motive behind the pushing of this claim, but that should not cause us to lay down unhealthy rules regarding transactions which the courts have said merit the strictest scrutiny.

Respondent differentiates this case from *Paxton* v. *Paxton,* supra. All these cases are different in details, but the technique is the same. A wife or close relative has advanced money to the defendant, years before, no evidences taken,

creditors become thicker or more menacing; what never was a debtor and creditor relationship, or what may have once been although long forgotten, is suddenly galvanized into life as the basis for a fair consideration. The details only vary; the source of the money claimed to have been loaned may be inheritance, boarders, business, or sewing but the technique is the same. I think we should encourage these stale relationships, of alleged debtor and creditor, if they ever existed, to remain undisturbed in the limbo of forgotten transactions where the parties assigned them.

Now as to the assignment of Mrs. Nellie B. Howell to David J. Davis. I think it has all the earmarks of a transaction designed to remove the asset one trench further back from the on-coming creditors. The evidence shows at the time of this assignment on May 26, 1934, the share of Ezra Howell's estate in the estate of Emmett J. Howell was worth approximately $1,335. Mrs. Howell purports to convey it for $160, advanced by Davis. Davis at the time was an engineer with a family making around $600 a year. The following is a sample of the testimony of these two, Nellie B. Howell and Davis, showing how they went into the transaction.

Mrs. Howell:

"Q. You assigned this interest in the estate to him for $160.00, without knowing what the interest consisted of or the approximate value of it?  A. Didn't have it to find out.

"Q. And you don't know now (that is to say the approximate value)?  A. No.

"Q. Maybe one thousand or ten thousand worth of property?  A. Well I just say I don't know what there is there.

"Q. Now as a matter of fact Mrs. Howell, you expect to pay Mr. Davis and get the interest in that estate that may be left, don't you?  A. Well, we have not decided that yet.

"Q. Did you intend to say that—don't you intend to claim interest in this estate when Mr. Davis is paid off?  A. Well, that will be an agreement between us, I suppose.

"Q. You understand now, do you, he is not going to take the estate if he gets his money back? A. That is something I have never been able to fathom.

"Q. Can you fathom it now Mrs. Howell? A. I don't know the future.

"Q. Do you intend to ask him for any of it? A. How do I know?

"Q. Have you any present intention? A. I don't know what I may do.

"Q. Have you any intention now to ask him? A. I have no way of knowing what I may do tomorrow.

"Q. Can't you tell what your present intention is as to whether you intend to ask him some day for this estate, if you pay him off? A. I have made no decision on it.

"Q. You have no intention at all? A. I have no decision on it.

"Q. So it is still undecided? A. I don't know what I am going to do.

"Q. Is that not in your mind now—that you intend to settle with Mr. Davis and claim the interest in this estate? I probably would like to, I don't know.

"Q. You don't intend to let him have that estate, do you, for $160.00, you can tell me that? A. Well, it would depend on what he has to say about it.

"Q. You will let him have it if he wants it? A. These are matters than you have discuss together on. I can't make up my mind something I would do and it happens.

"Q. You can make up your mind as to whether you have any interest or not? A. I will probably talk to him some time.

"Q. Probably claim it, wouldn't you, if he is paid? A. If he agreed to it.

"Q. This assignment was made simply to secure him, wasn't it? A. Yes.

"Q. Just to secure him? A. Yes.

"Q. And when he gets his money back the property is yours, isn't it? A. Well, it would be I suppose, if we agreed to it."

Mr. Davis:

"Q. Do you mean to say that she gave you that (referring to the assignment), without any agreement between you? A. Yes, that is the exact answer that I gave.

"Q. And you had no discussion at all as to what produced this paper? A. Exactly what I said * * *

"Q. You had no talk with her about this transaction at all? A. No sir.

"Q. In other words, she executed this to you and you gave her this money, and neither of you said anything? A. That is gone into in another question—what she told me she was going to sell me.

"Q. What was the conversation between you and her? A. I don't remember.

"Q. Now Mr. Davis, you know that you had some talk with her, don't you? A. I may have, yes.

"Q. What was it? A. I don't remember.

"Q. Do you have—A. I can't recall any of it.

"Q. You can't remember anything that was said? A. I say we had a conversation. Now, what that conversation is, I don't remember.

"Q. You don't know any part of it? A. No.

"Q. What did she say she wanted to sell you this interest for? A. So that she could get some money—that is all I know.

"Q. Well, you understood she wanted $160.00 didn't you? What did you say to her? A. I told her that I would let her have the $160.00.

"Q. And that is the entire conversation? A. So far as I can remember."

These bits of testimony here set out give some idea of the type of mediums which conveyed the testimony to the courtroom on which the court based its findings that there was a fair consideration to support these assignments. It further reveals more specifically the true nature of this purported assignment from Mrs. Howell to Davis.

I am also of the opinion that there is sufficient evidence that Ezra J. Howell was or would be made insolvent by the

transfer of his interest in Emmett Howell's estate on September 4, 1930. Certainly, he was hard pressed by creditors. In a matter such as this, it is not necessary to obtain a balance sheet to show the insolvency. At the time such concealed transactions may be discovered, it would be very difficult to prove insolvency with particularity. It is enough that the debtor himself shows that he believes himself in a precarious financial state and that he is ordering a retreat of his property.

The writer said in the case of *Greco* v. *Grako*, 85 Utah 241, 39 P. (2d) 318, 322:

"In so concurring I am not unmindful of the rule to the effect that, while a written record in an equity case may apparently show the preponderance of evidence in favor of a conclusion different from that reached by the trial judge, still the benefit of the doubt should be given to his conclusions where the imponderables, not revealed by the record, such as the manner and demeanor of the witnesses (very important indexes to credibility), might weigh in the scale sufficiently to reverse that apparent preponderance of the record. Where, however, the preponderance shown by the record is so great in favor of a conclusion different from that arrived at by the trial judge that the unrecorded parts of the trial could not reasonably be expected to change such apparent preponderance, or where, as in this case, some fact independent of any element which might affect the credibility of witnesses speaks eloquently of a wrong conclusion by the trial judge, the rule does not apply."

I think an examination of the testimony in this case meets that test. I do not think any unrecorded facts of the trial could possibly weigh on the scales sufficiently to make us conclude that the conclusions of the lower court were not markedly against the evidence.

This being a dissent from the basis and reasoning of the majority opinion, and since any conclusion I may come to regarding the point raised about the statute of limitations would not affect the result reached by the majority, I refrain from going into that question.