351 P.2d 959

Edwin B. GIVAN, Plaintiff and Appellant,

v.

Frank LAMBETH, sometimes known as
Frank R. Lambeth, et al., Defendants
and Respondents,

Frank LAMBETH, sometimes known as
Frank R. Lambeth, and Norman W.
Esmeier, Third-Party Plaintiffs,

v.

Bertrand T. GIVAN and Ina Givan, and
Helen Givan, Third-Party
Defendants.

No. 8955.

Supreme Court of Utah.

May 2, 1960.

Henriod, J., dissented.

Cline, Wilson & Cline, Milford, for appellant.

Sumner J. Hatch, Salt Lake City, for respondents.

CROCKETT, Chief Justice.

This is an appeal from the trial court's refusal to set aside, as fraudulent, certain conveyances by Frank Lambeth to his children. Plaintiff sued for moneys claimed upon four promissory notes executed by defendants, Frank Lambeth, Norman Esmeier and Corinne Lambeth Esmeier, his wife; and the court awarded plaintiff judgment for approximately $36,000 on these notes. But the trial judge, agreeing with an advisory jury, refused to find in accordance with plaintiff's contention that Frank Lambeth's conveyances of grazing lands, a sheep business and his home were fraudulent and refused to declare the $36,000 judgment a lien on said properties.

Plaintiff seeks review of the evidence, as is the duty and prerogative of this Court in a case in equity,[1] contending

1. Utah Const. Art. VIII, Sec. 9, providing that " * * * In equity cases

that the facts and circumstances point so unerringly to fraudulent conveyances that the judgment must be reversed, which we would do only if the evidence clearly preponderates against the trial court's findings.[2]

Plaintiff bases this action upon our Fraudulent Conveyance Act, Title 25, Ch. 1, U.C.A.1953:

Section 4—"Every conveyance made * * * by a person who is, or will be thereby rendered, insolvent is fraudulent as to creditors, without regard to his actual intent, if * * * made * * * without a fair consideration."

Section 7—"* * * [or if made] with actual intent * * * to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors.

This suit follows Rule 18(b), U.R.C.P., which allows an action for money to be combined with one to set aside a conveyance as fraudulent, without first having obtained a judgment for the money. The gravamen of the inquiry here is whether the conveyances by Frank Lambeth to his children fall within the above quoted statutory provisions.

Edwin Givan, and his brother, Bertrand, as Givans, Inc., owned an Oldsmobile and G. M. C. truck dealership in Cedar City, Utah. In October, 1952, they contracted to sell it (1600 shares of stock in the corporation) to Frank Lambeth and his son-in-law, Norman Esmeier. Three thousand dollars cash was paid in October, 1952, on the $60,000 purchase price. In February, 1953, the stock was actually assigned for an additional $16,000 cash, $34,900 in interest-bearing notes and the cancelation of some personal indebtedness of the Givans to the corporation. The notes totaling $34,900 were secured by a lien on the stock of Givans, Inc., which, subsequent to the sale, with the exception of 20 shares, was owned by Frank Lambeth and Norman Esmeier in toto. Plaintiff, Edwin Givan, is the assignee of the interest in the notes of his brother, Bertrand.

Insofar as we are concerned, it is to be assumed that the defendants were satisfied with their bargain when they purchased this business. But the facts are that its assets consisted primarily of buildings' and land which were heavily mortgaged and that the business had been in financial difficulties. However, Norman Esmeier had been its secretary and knew of these facts. By April, 1953, it was apparent that the new owners were not succeeding and that

the appeal may be on questions of both law and fact; * * * "; see Nokes v. Continental Mining & Milling Co., 6 Utah 2d 177, 308 P.2d 954.

2. Ibid.

it was in financial straits. Creditors started suing during May of that year, and the corporation was forced out of business before the end of 1953, as a result of judgments obtained by secured creditors.

In May, 1953 Frank Lambeth and his oldest son, Keith, recorded deeds and a bill of sale conveying Frank's land and sheep business to his four sons and the family home in Cedar City to all seven of his children. The deeds and bill of sale bear date and notary's acknowledgment of August 1, 1950. The evidence was that the father, Frank Lambeth retained possession of these documents until the summer of 1952, shortly prior to his entering into this business transaction, when he delivered them to his son, Keith, on behalf of the children.

The plaintiff argues that because of the nature of this action he must rely upon circumstances to prove his case and places emphasis on the facts above recited, and the more significant ones that it was in February, 1953, six months after the delivery of the conveyances, Frank Lambeth mortgaged his home for $10,000. (This money he turned over to the Givan brothers.) In connection therewith he signed a statement which contained a clause that "he is the owner in fee of the above described premises free and clear of any encumbrances, and that he will warrant and defend the same against all persons and claimants"; that likewise he borrowed an additional $1,-500 giving a second mortgage on this property in June, 1953; and also that in both his 1952 and 1953 income tax returns he reported ownership of the sheep business and the sons showed their income from it to be wages. The plaintiff insists that the foregoing circumstances are sufficient to compel a finding that the conveyances were fraudulent, notwithstanding any explanation offered by the defendants.

We agree with the plaintiff's contention that it is of little or no importance that the deeds and bill of sale were executed in 1950. It is not uncommon for a grantor to make such documents and retain possession of them. This is sometimes done in lieu of drawing up a will, a practice which is not without legal pitfalls with which we are not here concerned. But such conveyances are not effective until there is an actual delivery with intent to transfer ownership. This could not have been until their delivery in the summer of 1952. The question is whether the facts and circumstances surrounding the delivery render the conveyances subject to nullification for fraud.

The problem of attempting to set aside an allegedly fraudulent conveyance is not new either in this court or in the history of English and American law. A landmark case in the development of the law relating to fraudulent conveyances is known as Twyne's Case, a Star Chamber case de-

cided in 1601.[3] It coincidentally involved certain sheep. The debtor Pierce owed Twyne 400 pounds and was sued by a third party for 200 pounds. Before trial Pierce conveyed all of his property to Twyne reciting as consideration the prior debt. But he continued in possession, sold some of the sheep and evidenced all of the perquisites of ownership. The conveyance was set aside as fraudulent, the court assigning the following reasons, which have often since been referred to as the badges of fraud: that in the conveyance Pierce reserved nothing even for his own use even though he continued in possession and used the property as his own; that this evidenced a secret trust between the parties; that the conveyance was made pending the suit; and was kept secret; and finally that the conveyance itself "protested too much" in reciting that it was made "honestly, truly, and bona fide."

The decision also discussed conveyances between members of a family:

"And when a man, being greatly indebted to sundry persons, makes a gift to his son, or any of his blood, without consideration, but only of nature, the law intends a trust betwixt them, that the donee would, in consideration of such gift being voluntarily and freely made to him, and also in considera-

tion of nature, relieve his father, or cousin, and not see him want who had made such gift to him * * *"

* * * * * *

"And because fraud and deceit abound in these days more than in former times, it was resolved in this case by the whole Court, that all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud."

Human nature doesn't seem to have changed very much and we still take for granted that transactions between close relatives under circumstances of this kind are to be closely scrutinized when attacked by creditors of the grantor.[4] However, the mere fact that the transaction is among close relatives does not necessarily mean that it is invalid, but the true facts are subject to proof.

Plaintiff assails the finding that the deeds were delivered in August, 1952, on the ground that it rests solely upon the testimony of the defendants and there was no recording at that time. He further urges that even if it be assumed they were so delivered, this was just prior to and in contemplation of the dealings with him and was made with the intent to divest Frank Lambeth of assets for the purpose of even-

3. Coke, Rep. 80(b), 76 Eng.Rep. 809, 5 E.R.C. 2, 1 Smith Leading Cases, 1, 18 Am.Law Reg.N.S., 137.

4. Lund v. Howell, 92 Utah 232, 67 P.2d 215; Paxton v. Paxton, 80 Utah 540, 15 P.2d 1051, 1056.

tually preventing Givan from reaching them if that became necessary. The plaintiff claims there was no consideration for the conveyances because there was no actual contract between Frank Lambeth and his sons, nor any definite amount due them; but they had only the ordinary expectancy of eventual participation in their father's property. More pointedly he argues that the conveyance of the home to all seven children was without any material consideration.

Undoubtedly if the evidence were to be viewed in the light most favorable to the plaintiff's claim, it would support his theory. The difficulty with his position is that the evidence of the defendants must also be considered and that the jury and the trial court believed them. Their testimony was that the transactions were bona fide; and they made a plausible explanation of their actions.

On the question of the transfer of these properties, although the bare circumstances may seem to render defendants' position suspect, the explanation offered is not so incredible as to require rejection as a matter of law. In addition to their direct evidence as to the delivery, they point to other supporting facts: that it was obvious to everyone, including the Givans, that after World War II, Frank Lambeth had become comparatively inactive in his sheep and ranching operation, helping only a little at lamb-

ing time and in repairing fences, and that his sons had taken over practically complete operation and management.

To the charge that there was no specific contract nor debt due the sons, defendants rejoin that they naturally did not deal at arm's length with their father but had faith in his intention eventually to make it right with all of them. Their evidence is that each of the sons had worked in the sheep business and other family affairs, and that the father considered each to have an interest therein. He had explained to them, when they attained their majority, that they could continue to work in the family enterprise, not receiving full wages but drawing enough to cover expenses, and that they could expect full compensation later; that when Frank Lambeth died or retired each would receive his share in proportion to the services performed. The conveyance did divide the property equally among the boys except to the youngest of the four sons, Aubra, who received an extra share because he had remained on the ranch during World War II.

█ It is elementary that the love and affection a father has for his children is sufficient consideration to support a conveyance, absent fraud. In addition thereto, in regard to the family home there is a further fact which the defendants point to as important. This property had formerly been owned by Mrs. Lambeth's father,

grandfather to the children. There had never been any probate of the estate, but Frank Lambeth had obtained a tax deed to it, and the defendants say that it was understood among the family that this property would be held for all seven children.

Perhaps the most difficult aspect of the evidence to reconcile with the findings of the jury and the trial court relates to Frank Lambeth's mortgaging the home after he had conveyed it to his children. The explanation offered is similar to that indicated above with respect to the family dealings: that it was all in the family and that the children would have no objection to his so using the property to raise money he needed. Further, on his part, that he thought he could repay the loan out of the earnings of the motor company without eventual loss to his children. The financial statements were filled out on recommendation of the loan company. It is to be noted that these representations were not made to Givan so they were in no way fraudulent as to him, and that neither the children nor the party to whom the representations were made are complaining about them. As to the income tax returns: defendants say that they merely show that they are not experts in that field; and that all of the profits made were shown on the returns of members of the family. This explanation also applied to a checking account maintained in the name of Frank with his son, Keith, as a co-signer: it was merely a family convenience so that both the father and one of the sons could transact the necessary business.

A significant fact to keep in mind is that, in addition to receiving a very substantial portion of the purchase price of this business, the Givans secured themselves by retaining title to the stock and were able to forfeit Lambeth's interest. After this was done it seems quite understandable that the attempt to further pursue the assets of the Lambeth family and impress a lien upon their home for the balance of the purchase priced did not particularly appeal to the conscience of a fair-minded jury, nor of a court of equity.

Upon the basis of interrogatories submitted to the advisory jury and consistent with answers thereto the court found six primary facts: (1) the conveyances of the sheep and sheep ranch were delivered to Keith in August or September, 1952, and Frank Lambeth then had a present intent to convey; (2) the conveyances were for a fair consideration (services by the sons in handling and operating the sheep for a period of years prior to 1952); (3) Frank Lambeth was solvent, both at the time of the delivery in 1952 and at the time of recording in May, 1953; (4) the voluntary conveyance of the house was delivered at the same time as the other conveyances and was also for sufficient consideration; (5) there was no trust or other understanding between Frank and his sons that the owner-

294

ship of the property should be continued in him or for his benefit after delivery of the deeds and bill of sale; (6) on February 19, 1953, Givans, Inc. had a net worth of approximately $43,000, and there was insufficient evidence for the court to determine whether the assets had increased or decreased by May 18, 1953, when the deeds were recorded.

The critical question we confront is whether the circumstances urged by the plaintiff as pointing to fraudulent conveyances do so with such certainty that the jury and the trial court could not reasonably have believed the defendants' evidence to the contrary and have made the above findings. It is to be borne in mind that in pursuing the duty of reviewing the evidence in a case in equity this Court makes considerable allowance for the advantaged position of the jury and the trial court in close proximity to the parties and the witnesses which provides them a better basis for insight into the truthfulness of the testimony offered than is afforded by a review of the record.[5]

From our survey of the evidence in the light of the principles discussed in this opinion we conclude that it does not so clearly preponderate against the findings and judgment as to require that it be overturned.

5. See discussion in Nokes v. Continental Mining & Milling Co., footnote 2, supra;

Affirmed. Costs to defendants (respondents).

WADE and McDONOUGH, JJ., concur.

HENRIOD, J., dissents.

CALLISTER, J., not participating.

see also Barker v. Dunham, 9 Utah 2d 244, 342 P.2d 867.