513 P.2d 1011

Nels A. NELSON, Administrator of the Estate of Virgil Homer Nelson, Deceased, Plaintiff and Appellant,

v.

V. Homer NELSON et al., Defendants and Respondents.

V. Homer NELSON and Earline Nelson, Cross-Plaintiffs and Respondents,

v.

Nels A. NELSON, Administrator of the Estate of Virgil Homer Nelson, and Teresa K. Nelson, Cross-Defendants and Appellant.

No. 13100.

Supreme Court of Utah.

Aug. 31, 1973.

A. Park Smoot, Salt Lake City, for plaintiff and appellant.

Duane A. Frandsen, and Bryce K. Bryner, Price, for V. Homer Nelson.

Alke T. Diamant, Salt Lake City, for Teresa Nelson.

TUCKETT, Justice:

Plaintiff filed these proceedings in the court below seeking a decree annulling and setting aside a conveyance from Virgil H. Nelson to himself and Teresa K. Nelson, his wife, as joint tenants, and also a deed from Teresa K. Nelson to V. Homer Nelson and Earline Nelson, his wife. From an adverse decision plaintiff has appealed.

All of the persons involved in this suit are members of one family. Virgil H. Nelson and Teresa K. Nelson were husband and wife and the parents of ten children. Nels A. Nelson, the plaintiff herein, had been appointed administrator of his father's estate. V. Homer Nelson was a son of Virgil and Teresa and one of the grantees of a deed from his mother Teresa. Prior to February 26, 1968, Virgil was the owner of approximately 1700 acres of

land in Grand County, Utah. The land was in three separate tracts which were not contiguous but were within the same general area. The tracts of land are of mountainous terrain, and on the date above mentioned and prior thereto the land had been used for grazing. Virgil and Teresa owned other tracts of land in Salt Lake County as joint tenants. For a considerable period of time Teresa had urged Virgil to create a joint tenancy with her of the lands in Grand County.

On February 26, 1968, Virgil was confined to his bed suffering from various ailments but on that day he decided to sign a deed conveying the Grand County property to himself and Teresa as joint tenants. Teresa called a woman who lived in the neighborhood and who was a notary public to come to the Nelson home and acknowledge the deed. The notary did appear and the deed was signed by Virgil in the presence of the notary who took it into another room where she signed as notary and affixed her seal. Virgil died three days thereafter. After the death of Virgil, Teresa discussed with Homer his purchase of the property in Grand County which is the subject of this suit and which is referred to in the record and the pleadings as the "Homestead." On or about May 27, 1968, Teresa prepared and forwarded to Homer at his home in Green River, Utah, a uniform real estate contract which had been prepared by Teresa or under her direction. The contract recited the purchase price of $10,000 payable at the rate of $1,000 per annum and a down payment of $10. Thereafter, on or about July 18, 1968, Teresa executed a warranty deed conveying the property to Homer and Earline, his wife. In the sales transaction a portion of one of the tracts of land was reserved so as to give Homer's brothers and sisters a tract 150 feet wide and 2640 feet long. After Homer and his wife acquired title to the "Homestead," he and his wife mortgaged it to the Farmers Home Administration to secure a loan in the sum of $22,000.

Approximately one year after Teresa entered into the real estate contract with Homer she began having misgivings about the sale and attempted to persuade Homer and his wife to reconvey the "Homestead" to her so that she could convey the "Homestead" to all of her children jointly.

During the summer of 1970 the sale of the "Homestead" to Homer became known to the other members of the family who were disgruntled with the transaction. It appears from the record that Teresa had formulated a plan to recover the property by claiming that she had procured Virgil's name on the deed by a trick. These proceedings were commenced in September 1970 by the administrator of Virgil's estate filing his complaint seeking to set aside the deed. During the trial Teresa testified

that she procured Virgil's signature on the deed by placing it with other papers he intended to sign respecting grazing rights and in that manner she concealed from Virgil the nature of the document he was signing. She also testified that Homer was aware of the fraud. The testimony of Teresa was at variance with other out-of-court statements made by her and letters she had written prior to the time she set about attempting to recover the "Homestead" from Homer.

The trial court elected not to believe the testimony of Teresa and concluded that the deed from Virgil creating joint tenancy in himself and Teresa was valid. The court further found that the real estate contract entered into between Teresa and Homer and his wife and the warranty deed from Teresa to Homer and his wife were valid and binding upon the parties.

The record supports the court's findings as it appears that Virgil prior to his death was in the process of perfecting certain water rights and also litigating grazing rights, and after the death of Virgil, Teresa urged Homer to continue with perfecting the water filing and to appeal a grazing decision. Conversations between Homer and Teresa led to the conclusion that Homer would be unable to continue the litigation part to perfect the water rights unless she was owner of the property. Prior to the transaction between Teresa and Homer he had urged Teresa to offer the "Homestead" to other members of the family and to permit them to bid on it. Teresa was of the opinion that other members of the family would not be interested and that Homer was the proper person to have the "Homestead" inasmuch as he lived near the property and could make use of it. It appears that the terms of the transaction were largely dictated by Teresa and that she spent considerable time drafting the real estate contract and setting forth the terms of the purchase. It also appears that the purchase price arrived at in the transaction was reasonable in view of the use to which the "Homestead" was put at the time.

■ The relationship of parent and child does not constitute such a confidential relationship as to create a presumption of fraud or undue influence. The evidence in this case is insufficient to show a reposal of confidence by one party and the resulting superiority and influence on the other party.[1] There is nothing to show that Homer exercised any undue influence over Teresa. Teresa is an educated woman and had taught school for a period of approximately 24 years.

It should be noted the testimony of the notary public who was present at the time Virgil signed the deed in question did not observe any trickery in procuring Virgil's

1. Bradbury v. Rasmussen, 16 Utah 2d 378, 401 P.2d 710.

signature, and it would appear from her testimony that she was unaware of any concealment of the nature of the papers being signed by Virgil.

■ Plaintiff had the burden of proving by clear and convincing proof that the conveyance from Virgil to Teresa was obtained by fraud and that Homer either participated in the fraud or had knowledge of it.

■ The trial court was in an advantaged position in evaluating the testimony of the witnesses as to its veracity and the weight to be given to it. This being a suit in equity, it is the duty of this court to weigh the facts as well as the law, but we reverse only if the evidence clearly preponderates against the findings of the trial court.[2]

■ After a careful consideration and examination of the testimony and other evidence we find no basis for reversing the judgment of the court below, and that decision is affirmed. Respondent is entitled to costs.

CALLISTER, C. J., and HENRIOD, J., concur.

2. Givan v. Lambeth, 10 Utah 2d 287, 351 P.2d 959; Brimhall v. Grow, 25 Utah 2d 298, 480 P.2d 731; Bartlett v. Whidden (Or.), 449 P.2d 850.

ELLETT, Justice (dissenting):

I dissent.

This is a case in equity to cancel two deeds. In such a case this court gives due consideration to the fact that the trial judge saw the witnesses and heard the evidence. However we need not affirm his findings merely because there is some credible evidence to sustain them. As was stated in the case of Cram v. Reynolds et al.,[1]

. . . [W]hen in an equity case findings of fact are clearly not, in our opinion, justified by the evidence, it is our duty to arrive at the conclusion we think is compelled by the proof, regardless of the opinion of the trial judge.

There is no dispute in the evidence. The trial judge elected not to believe the defendant Teresa Nelson and so ruled against the plaintiff. In doing so I think he erred.

Virgil Homer Nelson was the husband of Teresa and the father of V. Homer Nelson. He became a semi-invalid in 1936 with a 75 per cent disability and depended entirely upon his wife for his care and comfort. She was in constant attendance upon him at all times during almost one third of a century.

1. 55 Utah 384, 186 P. 100 (1919).

Among the properties which he owned were some 1700 acres of land in the mountains which he called the Homestead. Teresa for a long time had importuned him to put this land in joint tenancy with her, all to no avail. He always said that it was to be for all of the children. About a month before he died he made his will[2] wherein he provided: "The Homestead must not be sold for 20 years. At that time my children will decide how it shall be disposed of."

Teresa feared that the lawyers would get everything in case of probate proceedings, and she was determined to get the Homestead in their joint names so as she thought to avoid probate proceedings.

Virgil Homer Nelson became seriously ill two weeks before he died, and suffered greatly from pain. A doctor prescribed medicine for his pains, and on Sunday, February 25, they subsided. On Monday following, Teresa secured his signature to a deed which she had secretly caused to be prepared. Her testimony explains how it was accomplished:

Q. What did you do to get him to sign those papers? First, let me ask you, did you help him sign the papers? Answer that.

A. I helped him sign the papers after that.

Q. When did you do it?

A. On Monday morning, February 26.

Q. All right, Monday morning. He died the 29th so this would be the last Monday that he lived?

A. That's correct.

Q. All right. Now tell us what you did and what happened?

A. About the deed?

Q. Yes, about getting, what you did about getting him to sign the deed.

A. I said to him that Monday morning, Paw don't you think you better sign those grazing papers? And he said, yes.

Q. Now what was his condition at that time?

A. All right. At that time he was bedfast. He hadn't been out of the bed since Sunday about noon.

Q. And what did you observe as to his condition generally at that time on Monday?

A. He was very, very, very sick. Very. And couldn't get out of bed.

Q. Did this have anything to do with your talking to him about signing the papers?

---

2. This will failed to comply strictly with the statutory provisions and hence could not be admitted to probate, but it did show what his feelings were about the particular land in question.

A. I, his hand was swollen. He, his face was white. And his hands were white. He had stopped eating. He was using the bed pan. Sunday night, a urinal. And very, very weak and I thought Poppa isn't going to get well. I've got to get that deed signed.

\* \* \* \* \* \*

A. I stood by the drawer, my secretary drawer where I had that deed and debated. If Paw does get well I may not ever have to show it to him. This is maybe the last chance I'll ever get to get that deed signed so the homestead won't have to be probated.

Q. So what did you do?

A. I took the deed, put it, inserted it between those three sheets of the grazing papers that I knew he wanted to sign. That I had asked him before. I put them in between those three sheets. Then I went to the telephone. I telephoned to my neighbor, Mrs. Georgann Wilson Christenson. I told her on the phone, Mrs. Christenson I have a deed that I would like to have you sign—no, to notarize. Could you come over right away? This is real early in the morning. On Monday morning. When she came over I said, now don't appear as a notary. Just be a friend. I was afraid that if she was acting as a notary that my husband would catch on. So she came into the bedroom. Said, how are you Brother Nelson? He says, pretty good. She came in and sat down kind of close to the bed. And I said, well Poppa maybe you better sign these papers now. These grazing right papers. I helped him, I put his feet on the floor, helped him to a sitting posture. Sat down by him. With pen in my hand. I had a magazine, a large magazine with the four papers on it. I held it, the first one he could see was a grazing right paper. He signed his name at the bottom where it said signature. He did that himself. He had the pen, I didn't have to help him do that. Then I turned that paper a little bit, just a little. And he signed his name. I turned that paper over, and he signed his name just a little bit higher. I turned that one over and he signed his name a little bit lower again. I just laid them over there and Mrs. Christenson helped my husband put his feet back on the bed and lay down again. She took the papers out into the living room table. Looked through them, saw the deed. I guess she saw, she took the deed over to a neighbor.

To hide her perfidy she told some of her children that her husband had finally seen the light and had voluntarily signed the deed. On the witness stand she admitted making the false statement.

In a memorandum decision the trial judge stated:

> . . . When a witness has made false statements, whether or not under oath, it is very difficult for the Court to determine when that witness was or was not telling the truth. . . .
>
> \* \* \* \* \* \*
>
> Since a fraud of this character must be proved by clear and convincing evidence, the Court finds that the Plaintiff has not sustained this burden of proof, and therefore finds and holds that said joint tenancy deed was not obtained by fraud and was and is valid and binding.

The trial judge seems to have lost sight of the fact that Teresa was a defendant testifying against her own interest in the matter. Besides, when a gift is obtained by one in a superior position from one who depends and relies upon such a person, there arises a presumption that the gift was obtained by fraud, and the burden is upon the donee to rebut that presumption.[3] The plaintiff not only proved fraud from the testimony of the defendant herself, but in addition thereto corroborated the fraud by calling Georgina Christenson (now Cottam) whose name appears on the deed as the notary who took the acknowledgment of the grantor. Mrs. Cottam testified as follows:

> A. She called me early in the morning. I am a director of the Senior Citizens Center in Firmont Park and I go there every morning. I would. And she called me early in the morning before I left to go to the center and asked me if I would come over and notarize her husband's signature. So I immediately went over and she met me at the door. And she said, he's in the bedroom. He is ill. And she had the papers to be notarized, and I went in the bedroom. And I said, good morning Brother Nelson. How are you today? And he says, just fine but I'm weak. And she brought the papers in for him to notarize. And she put his feet over on the floor. And had him sitting up. And she took a book and the papers. Now she had a sheaf of papers and one was the deed in with some other papers and the others were something to do with grazing. But I did not read the papers. What was in them. I—he signed them. She turned the papers. He signed each one. I took, she turned and handed them to me. I went in the living room. Signed my name. Put the seal on them.
>
> . . .

---

3. Omega Inv. Co. v. Woolley, et al., 72 Utah 474, 271 P. 797 (1928); In re Swan's Est., 4 Utah 2d 277, 293 P.2d 682 (1956); Johnson v. Johnson, 9 Utah 2d 40, 337 P.2d 420 (1959).

Q. Did Teresa say anything to him immediately before or while he was signing these papers?

THE COURT: In your presence.

A. In my presence?

MR. SMOOT: And in your memory.

A. Seems to me that she said something about the grazing papers. As near as I can remember. But all I did was to notarize his signature.

THE COURT: You didn't put him under oath?

A. No I didn't put him under oath. No, sir.

Immediately after the funeral of Virgil Homer Nelson the defendant V. Homer Nelson began trying to get his mother, Teresa Nelson, to deed the homestead to him. He and his wife, Earline, had given Teresa a book on how to avoid probate proceedings in the courts. Finally he entered into a uniform real estate contract to purchase the 1700 acres of land for $10,000 payable $10 down, the balance to be paid at the rate of $1,000 per year without interest, the first $1,000 to be paid January 1, 1970, some one and one-half years in the future.

V. Homer Nelson testified that he, his wife, and Teresa signed the contract May 29, 1968. Thereafter and on or about July 18, 1968, Teresa gave a warranty deed covering the Homestead property to V. Homer Nelson and his wife, Earline, with a small tract 150 feet wide reserved to each of the other children.

The court found that $10,000 was a fair price to be paid for the land, although a realtor had testified that it was worth $40,000. Soon after receiving the deed, V. Homer Nelson mortgaged it for $22,000.

Teresa testified that V. Homer knew of the scheme she had practiced to get the deed signed by her husband. I am of the opinion that the deed to V. Homer cannot stand regardless of his complicity in the matter for the reason that his grantor, Teresa, had no title under the forged deed from her husband.

The law can be found in 11 A.L.R.3d at page 1076, where the editor of an annotation regarding obtaining a signature by artifice or deceit stated:

Where the genuine signature to an instrument has been procured by artifice or deceit, without an intent on the part of the party signing to execute such an instrument, the attitude of the courts has been that the signature thereto should be treated as a forgery.

In my opinion the finding of the trial court should be that Teresa obtained the deed from her husband by fraud and that it is a mere nullity and further that the deed from Teresa to V. Homer Nelson and his wife, Earline, is of no force and effect

I would therefore reverse the judgment rendered and award costs to the appellant.

CROCKETT, Justice (dissenting):

I make due allowance for the universally accepted rule: that fraud of this character must be proved by clear and convincing evidence, and also for the advantaged position of the trial court. Nevertheless, in my judgment the evidence so clearly and persuasively shows that the deceased was tricked into signing the deed, that it should be nullified. What more clear and convincing evidence would anyone want than to have the grantee of the deed confess under oath her own wrongdoing as did Teresa Nelson, that due to remorse of conscience, because she had deceived her dying husband, she had resolved to tell the truth and rectify the wrong she had done.

In addition to such credit as undisputed sworn testimony is normally given, in my opinion her evidence has substantial additional assurances of credibility. Without pursuing the detail as to what her economic advantage would be in having received the entire property, as compared to having it go into the estate and presumably receive one third, it seems safe to assume that it would be to her advantage to have received the entire property. This is especially so if the representations of the defendant V. Homer Nelson are true as to the fairness of the contract.

But beyond this, and what is more important to me, is the fact that it would undoubtedly be quite an embarrassment for her to expose her own avarice in attempting to get the property herself by deceiving her husband. Moreover, the only direct evidence touching upon the truthfulness of her testimony as to how she accomplished the trickery, is that of the notary. It is significant and should be persuasive, that the testimony of the notary, a disinterested witness, corroborates the circumstances of the signing just as Teresa described it. All of the evidence points so unerringly to the conclusion that she tricked her husband into signing the deed that I think this is a patent case where this court should say that the evidence clearly preponderates to the contrary and substitute its finding for that of the trial court.

For similar reasons of credibility I think the evidence and the circumstances show clearly and persuasively the truthfulness of her testimony that her son, defendant V. Homer Nelson, knew or should have known the facts and that he should not be deemed to have obtained any advantage in procuring her to enter into the contract.