337 P.2d 420

Narvol A. JOHNSON and LaFaun J. Fleming, as the Guardians of the Person and Estate of Arthur Johnson, an incompetent, Plaintiffs and Respondents,

v.

Calvin C. JOHNSON and Anna R. Johnson, his wife, Defendants and Appellants.

No. 8888.

Supreme Court of Utah.

March 19, 1959.

Pickett & Pickett, St. George, for appellants.

Hafen & Nelson, St. George, Edward W. Clyde, Salt Lake City, for respondents.

CROCKETT, Chief Justice.

This is a suit by Narvol Johnson and LaFaun Johnson Fleming as guardians of their father, Arthur Johnson, to rescind certain instruments relating to the conveyance of the father's property to their younger brother, Calvin Johnson.

The trial court found in accordance with plaintiffs' contentions that the instruments were procured by (a) fraud and deceit, and (b) duress and undue influence practiced upon their father, and also upon the ground of his incompetency to execute them. Calvin Johnson appeals. The gravamen thereof is that the evidence does not support such findings.

At the time of the trial Arthur Johnson was 72 years of age. Because of illness he was feeble and apparently more senile than is usual for that age. He and his wife, who died in 1953, had been industrious and frugal and had acquired considerable money and property. He owned business property on Center Street in Kanab, Utah, consisting of his grocery store, and several shops, stores, and cabins, which he rented, all of which produced a rental income of about $1,300 per month. This town property had an appraised value of $150,000. He also owned some property outside the town, used in a ranch operation, valued at about $13,000.

It appears that the youngest son, Calvin, was closer to his father than these plaintiffs, the two older children, in more than one sense of the word. He assisted in the handling and management of the business and gradually increased his control until he finally dominated his father's affairs. Meanwhile, these plaintiffs had married and left the family. LaFaun now lives with her husband and family in Midvale, Utah;

and Narvol operates a service station in Kanab.

In regard to the documents challenged in this action, the evidence discloses:

On the 20th of July, 1955, the father Arthur Johnson made a deed to Calvin to the ranch property above referred to. It was prepared by an attorney who testified that at the time of its execution Arthur Johnson stated to Calvin, "You have paid for that property" or words to that effect.

On the 20th of May, 1956, in a similar transaction Arthur made and delivered a deed to Calvin for the town property in Kanab. It is a bit strange that at the time of the execution and delivery of this deed under which Calvin claims, the attorney prepared and the parties entered into an agreement by which Calvin was to purchase the same property for $50,000. It provided for monthly payments of $300, with no interest to be charged while Arthur Johnson was alive. And further, that at the same time the attorney prepared a will which Arthur Johnson executed, naming Calvin as executor, devising his property in equal shares to his three children.

Calvin had the deed to the town property recorded shortly thereafter, but the purchase contract has never been recorded. In May, 1957, plaintiffs discovered the fact that the business property had been conveyed to Calvin. When he was confronted

with this, a family quarrel ensued in which Calvin acknowledged that he had the deed to the business property and insisted that he was going to keep it. But he did not mention the contract of purchase, nor that the field property had also been conveyed to him. The deed to the field property was not recorded until January, 1958. This was considerable time after Arthur Johnson had been declared incompetent in August, 1957, and these plaintiffs were appointed his guardians, and had commenced this suit in October, 1957.

In assaying the sufficiency of proof, the plaintiffs here have significant help in the rule that when a confidential relationship is shown to exist and a gift or conveyance is made to a party in a superior position, a presumption arises that the transaction was unfair.[1] This presumption has the force of evidence and will itself support a finding if not overcome by countervailing evidence. Therefore the burden was upon the defendant Calvin Johnson to convince the court by a preponderance of the evidence that the transaction was fair.[2] If he failed to do so, the finding to the contrary was justified, and it will not be disturbed on appeal unless the contrary evidence was so clear and persuasive that all reasonable minds would so find.

There can be no doubt about the existence of a confidential relationship here of the very kind for which the above rule was fashioned. The evidence shows that his father reposed great confidence in Calvin. This is epitomized by his cooperating with him in making final arrangements about his property for the eventuality of death.

In corroboration of the presumption discussed above there is affirmative evidence tending to support the idea that Calvin was taking unfair advantage of his father to get the family property for himself and deprive the plaintiffs of it. It is important to have in mind that Arthur Johnson was aged, and was feeble in body and mind. He had suffered a great deal of illness and had undergone two serious operations, all of which apparently made him prematurely senile, some details so indicating we will recite below.

It was Calvin who talked to the attorney about preparing the papers referred to above, by which on the same day Arthur Johnson executed two documents on his town property which appeared to be inconsistent with each other, the deed and the contract; and the will might also be considered inconsistent with them. The latter quite strongly suggests that he desired to treat his children equally by dividing the property among them and may well have

1. Omega Investment Co. v. Woolley, 72 Utah 474, 271 P. 797, quoting 2 Pomeroy, Equity Jurisprudence, sec. 956.

2. In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682.

been led to believe that he was doing so. The evidence is patently susceptible of interpretation that he so thought and that he was not aware of deeding it off as attested by these facts: that thereafter Arthur Johnson and Calvin continued to treat the property as if it had never changed hands; the rent checks continued to be made out to Arthur Johnson and deposited in his account; two leases were executed and Arthur Johnson was named lessor; and Arthur Johnson talked to his son Narvol about selling the property to him for $100,000.

In determining whether such a conveyance was procured by duress and undue influence the state of the subject's health of body and mind may be considered as bearing on his will to resist and the likelihood of it being overcome.[3] There is a plethora of evidence that about the time of these transactions Arthur Johnson was becoming senile, and was so afflicted that he would be an easy prey to a scheming person in whom he had confidence. The condition of a man's mind is best shown by specific examples of his conduct. There is little doubt that as early as 1954 Arthur Johnson had developed some degree of mental infirmity. In that year he forgot where his wife had buried $30,000 and also where he himself had buried some money. Both the burying and the forgetting are significant. It was shown that in 1955 he would go down town with his pants unbuttoned; sometimes appear in public in various stages of undress; and on one occasion at least, naked. He rented cabins to Indians one day, had the officers evict them as undesirable because of their conduct the next, and then re-rented the cabins to them. He was disoriented: while staying at LaFaun's place in Midvale he thought he was in Kanab; he went into the post office to get a haircut; and was unable to properly attend to the necessities of his person, or to bathe or shave himself.

On April 30, 1956, he entered the Kane County Hospital; on May 18, 1956, the hospital record shows the following notation: "Dr. Fulstow in, patient up and about, apparently does not know where he is." On that day he was released from the hospital. It was two days later in Calvin's home that he executed the deed, contract and will. Upon the basis of the facts shown we see nothing unreasonable in the finding that Calvin Johnson used duress and undue influence in getting his father to execute the documents in question. This renders it unnecessary to be concerned further as to whether he was competent to make a will in the absence thereof.

There is another aspect of this appeal: defendant assigns error of the trial court in refusing his timely demand

3. See discussion in Fox v. Piercey, 119 Utah 367, 227 P.2d 763.

for a jury trial. He concedes that the issue as to setting aside the deeds and the contract is in equity and properly triable to the court, but insists that the attack upon the will is in action at law,[4] and hence he was entitled to have the issues of fact determined by a jury. We agree with the latter principle. However, this action does not involve a will contest in the true sense of that term. It is generally held that a will can be contested only after the death of the testator.[5] Until then the heirs have only an expectancy and their rights have not vested, so they have no basis for an action. Furthermore, as a general rule, there would be no point in adjudicating the validity of a man's will while he was alive, because he might revoke a spurious will and make a valid one at any time. There may be some unusual circumstances where it would be proper to adjudicate the question as to the validity of a will before the testator's death. But we are not concerned with any such problem here.

The trial court properly regarded this proceeding as in essence an action in equity to declare void instruments by which Calvin Johnson purported to obtain his father's property. The fact that one of the documents involved in the transaction is a will is simply an incident to the entire picture.

This does not transform this action into a will contest. Due to the nature of the action it was within the prerogative of the court to refuse the request for a jury.

Affirmed. Costs to plaintiffs (respondents).

WORTHEN and McDONOUGH, JJ., concur.

HENRIOD, J., concurs in the result.

WADE, Justice (dissenting in part).

I concur except I think this is an action to recover real property and under Section 78–21–1 defendant was entitled to a jury trial. That section provides that "[I]n actions for the recovery of specific real or personal property, with or without damages * * * an issue of fact may be tried by a jury, unless a jury is waived or a reference is ordered." We have held a number of times that this statute is controlling.[1]

Defendant did not claim the right to a jury under this statute. He claims that this is a law action because it is a will contest. He seems to concede that the action to recover the real estate is a suit in equity because it seeks to set aside a

4. In re Lavelle's Estate, 122 Utah 253, 248 P.2d 372.
5. Bancroft's Probate Practice, 2nd Edition, Sec. 171, 57 Am.Jur., Wills, Sec. 765, Sternberg v. St. Louis Union Trust Co., 394 Ill. 452, 68 N.E.2d 892.

1. Norback v. Board of Directors, 1934, 84 Utah 506, 37 P.2d 339; Petty v. Clark, 1942, 102 Utah 186, 129 P.2d 568; Same case on retrial, 1948, 113 Utah 205, 192 P.2d 589; Holland v. Wilson, 1958, 8 Utah 2d 11, 327 P.2d 250.

contract of sale and a conveyance and a will on the ground of fraud, undue influence and incompetency. It is hard to understand how a will contest is a law action but a suit to cancel a will before the testator's death but after he has become incompetent is a suit in equity. This illustrates the maze of inconsistencies and borderline decisions required in applying the rule that the right of a jury trial is determined by whether the question is raised in an action at law or a suit in equity or whether the issues are legal or equitable.[2]

---

2. See my dissenting opinion in Valley Mortuary v. Fairbanks, 1950, 119 Utah 204, 233, 225 P.2d 739, 754.