Richard A. VON HAKE, Plaintiff
and Respondent,

v.

Ed THOMAS and First National Credit
Corporation, a Nevada corporation,
Defendants and Appellants.

v.

DRILLCO NO. 2, Energy Leasing, Ltd.,
and Energy Leasing No. 2, Utah limited
partnership, Applicants for Interven-
tion.

No. 18649.

Supreme Court of Utah.

Aug. 22, 1985.

Rehearing Denied Sept. 17, 1985.

George E. Brown, Jr., Midvale, for 1st Nat. Credit Corp.

Thomas R. Blonquist, Salt Lake City, for Drillco No. 2 et al.

T. Quentin Cannon, H. Ralph Klemm, Salt Lake City, for Von Hake.

ZIMMERMAN, Justice:

Defendants First National Credit Corporation and Ed Thomas, president of the corporation, appeal from a jury verdict finding them jointly and severally liable to plaintiff Richard A. Von Hake for damages arising out of defendants' fraudulent acquisition of Von Hake's ranch. We affirm the jury's award of $487,200 in actual damages and $500,000 in punitive damages.

Von Hake owned an 80 percent interest in the Seeps Ranch located near Kanab, Utah.[1] Von Hake had owned the ranch for nearly forty years. At the time of trial, the ranch was valued at over $1 million. In 1979, Von Hake defaulted on two loans totalling $100,000 that were secured by mortgages on the ranch. As a result, the lender initiated foreclosure proceedings.

To avoid losing the ranch, Von Hake, who was 82 years old at the time, immediately sought assistance from several people. During this time, defendant Thomas was introduced to Von Hake by a local real estate broker. Von Hake initially declined to discuss the matter with Thomas because he was negotiating with another party;

---

1. Von Hake had previously conveyed a 20 percent interest in the ranch to individuals unconnected to this action.

however, when these negotiations failed, he contacted Thomas.

In March and April of 1979, the parties met, both at Von Hake's residence in Kanab and at Thomas's home in Salt Lake City, to discuss the ranch. Von Hake revealed to Thomas his elaborate plans—or dreams—for developing the ranch into a recreational property. Von Hake testified that after these discussions Thomas agreed to go into business with him, boasted to Von Hake's friends and his own acquaintances that he was going to save Von Hake's property, and proposed the creation of a new corporation to develop the ranch as a recreational property. According to Von Hake, under the terms of their understanding Von Hake would contribute his equity in the ranch to the new corporation, while Thomas would furnish the funds to avoid foreclosure and to initially develop the property.

Approximately two weeks prior to the foreclosure sale, Thomas stayed overnight at Von Hake's home. The two again discussed Von Hake's plans for developing the ranch. Von Hake testified that after discussing their business plans, Thomas asked him to execute a warranty deed so that he could raise funds for purchasing the ranch at the foreclosure sale. Von Hake was led to believe that money was being raised to "save" the ranch and pay expenses incident to forming the new corporation and initial development costs; he therefore executed the warranty deed. The parties also agreed to meet several days later to draw up formal papers setting out the terms of their agreement to jointly form a corporation and develop the ranch.

Thomas testified differently about this encounter. He stated that until this meeting Von Hake had not made him aware of the impending sale and that during the overnight visit, Von Hake indicated an interest in any offer Thomas could make to avoid losing the ranch. Thomas testified that the next morning he offered Von Hake $10,000 for whatever equity he had in the ranch and agreed to protect him from any deficiency judgment that might result from the foreclosure sale. According to Thomas, Von Hake accepted the offer and executed a warranty deed in favor of a corporation owned by Thomas.

The following week, the parties met at the office of Thomas's attorney, Ronald C. Barker. Von Hake testified that he wanted his own attorney present, but that Thomas had been unable to reach the attorney. Thomas urged Von Hake to sign the papers in the absence of his attorney, telling Von Hake that his attorney had done nothing for him in the past and that "he will not do anything for you now." Barker prepared another deed conveying the ranch to defendant First National Bank Credit Corporation; it was then executed. When Von Hake asked to have his attorney review the deed, Barker told him that they would review the agreement concerning development of the ranch with Von Hake's attorney later and at that time complete the entire transaction.

The foreclosure sale was held the following week. Von Hake met Thomas at the courthouse before the bidding began. After the lender made an initial bid, a neighboring rancher named Goodfellow began to bid against Thomas. When the bids reached $160,000, Thomas approached Goodfellow, represented himself as Von Hake's partner, and told Goodfellow that his bid would only cause Von Hake to pay more for the property when he redeemed it. Because Goodfellow did not want to injure Von Hake, he stopped bidding. The ranch was then sold to defendant First National Bank Credit Corporation, utilizing funds tendered by Thomas, its president and agent. Von Hake did not redeem the property.

Immediately after the sale, Thomas invested a large amount of money to develop the property as a ranch and to prove up water rights. No effort was made to develop the ranch as recreational property. When Von Hake approached Thomas about formalizing their agreement to jointly develop the ranch for recreational purposes, Thomas indicated that he was now the owner of the property and that no such agree-

ment ever existed. He refused to discuss the matter further with Von Hake, who thereafter instituted this action.

The case was tried on two related theories: first, that Thomas, having a confidential relationship with Von Hake and a concomitant fiduciary duty, had constructively defrauded Von Hake; and second, without regard to any confidential relationship, that Thomas had actually defrauded Von Hake. The jury found for plaintiff on both theories, awarding actual damages of $487,200 and punitive damages of $500,000. On appeal, defendants claim that the evidence was insufficient to support the finding of liability on either theory. In addition, they assert that the jury's award of punitive damages should be set aside because it was based solely on passion and prejudice.

■ We first consider defendants' claim that the evidence was insufficient to establish liability under either of the two theories asserted. A party claiming that the evidence does not support a jury's verdict carries a heavy burden. The evidence is considered in the light most supportive of the verdict, *Berkeley Bank for Cooperatives v. Meibos*, Utah, 607 P.2d 798, 800 (1980), and we will not substitute our judgment for that of the jury where the verdict is supported by substantial and competent evidence. *Schwartz v. Tanner*, Utah, 576 P.2d 873, 875 (1978). To successfully attack the verdict, an appellant must marshal all the evidence supporting the verdict and then demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it. *Scharf v. BMG Corp.*, Utah, 700 P.2d 1068, 1070 (1985). Having considered the evidence in accordance with this standard, we agree that the evidence does not support a finding of constructive fraud. However, we affirm the finding of liability for actual fraud.

■ A confidential relationship is a prerequisite to proving constructive fraud. A confidential relationship arises when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party. *Blodgett v. Martsch*, Utah, 590 P.2d 298, 302 (1978).

The doctrine of confidential relationship rests upon the principle of inequality between the parties, and implies a position of superiority occupied by one of the parties over the other. Mere confidence in one person by another is not sufficient alone to constitute such a relationship. The confidence must be reposed by one under such circumstances as to create a corresponding duty, either legal or moral, upon the part of the other to observe the confidence, and it must result in a situation where as a matter of fact there is superior influence on one side and dependence on the other.

*Bradbury v. Rasmussen*, 16 Utah 2d 378, 383, 401 P.2d 710, 713 (1965) (citations omitted). Whether such a confidential relationship exists is generally a question of fact. *Blodgett v. Martsch*, 590 P.2d at 302.

■ The law presumes that one ordinarily makes his or her own judgments, however imperfect, and acts on them; it does not readily assume that one's will has been overborne by another. Therefore, the law does not lightly recognize the existence of a confidential relationship. However, if a confidential relationship is found to exist between parties, any transaction that benefits the party in whom trust is reposed is presumed to have been unfair and to have resulted from undue influence and fraud. *Bradbury v. Rasmussen*, 16 Utah 2d at 383, 401 P.2d at 713; *Cunningham v. Cunningham*, Utah, 690 P.2d 549, 553 (1984). The benefiting party then bears the burden of persuading the fact finder by a preponderance of the evidence that the transaction was in fact fair and not the result of fraud or undue influence. If that burden is not carried, the transaction will be set aside. *In re Swan's Estate*, 4 Utah 2d 277, 293, 293 P.2d 682, 693 (1956); *Johnson v. Johnson*, 9 Utah 2d 40, 43–44, 337 P.2d 420, 422 (1959); *Bradbury v. Rasmussen*, 16 Utah 2d at 383, 401 P.2d at 713; *Cunningham v. Cunningham*, 690 P.2d at 553.

In the instant case, the evidence is insufficient to establish that a confidential relationship arose between Von Hake and Thomas. Although Von Hake was 82 years old and distressed over the imminent sale of the ranch he had owned for forty years, and Thomas clearly induced Von Hake to believe that he was interested in "saving" the ranch, those facts alone did not require Thomas to act as a fiduciary toward Von Hake. No evidence suggests that Von Hake so trusted Thomas that Thomas was able to substitute his will for Von Hake's. *See Renshaw v. Tracy Loan & Trust Co.*, 87 Utah 364, 369, 49 P.2d 403, 405 (1935). The parties had no long-established relationship of trust as supported the finding of a confidential relationship in *Cunningham v. Cunningham*, 690 P.2d at 550–51, nor was Thomas's relationship to Von Hake one that traditionally imposes a fiduciary duty, such as an attorney/client relationship, as in *In re Swan's Estate*, 4 Utah 2d at 281, 293 P.2d at 684. And while Von Hake was elderly, there is no evidence that he was feeble or not in full possession of his faculties. Von Hake at all times was aware that he could and should consult his own attorney about the deal he was making, although admittedly Thomas and Barker talked him out of doing so. It is true that Thomas worked hard to ingratiate himself with Von Hake and to gain his confidence, but that is likely to be true of anyone who defrauds another. There is no evidence that at any time Von Hake relinquished control over his own decision making. Rather, these facts present something of a "garden variety" fraud case, in which one party intentionally or recklessly misrepresents a presently existing material fact, thereby inducing another to reasonably rely and act upon that falsehood to the other's detriment. *Cheever v. Schramm*, Utah, 577 P.2d 951, 953–54 (1978); *Mikkelson v. Quail Valley Realty*, Utah, 641 P.2d 124, 125 (1982). Accordingly, the evidence here cannot support a finding of a confidential relationship.

With respect to whether actual fraud was proven, the question turns on whether Von Hake actually and reasonably relied upon Thomas's false representations and whether the false representations were made under circumstances likely to lead to deception. These are factual matters. *Stuck v. Delta Land & Water Co.*, 63 Utah 495, 528–29, 227 P. 791, 804–05 (1924); *Lewis v. White*, 2 Utah 2d 101, 103–04, 269 P.2d 865, 866–67 (1954); *Berkeley Bank for Cooperatives v. Meibos*, 607 P.2d at 801. The jury's findings must be supported by clear and convincing evidence. *Taylor v. Gasor, Inc.*, Utah, 607 P.2d 293, 294–95 (1980).

Defendants challenge the jury's finding of actual fraud on two bases. First, defendants assert that Thomas's promise to form a jointly owned corporation with Von Hake to develop the ranch into recreational property in accordance with Von Hake's hopes cannot provide the basis for a fraud action because a false promise to act in the future does not constitute a misrepresentation of a presently existing material fact. This argument is entirely specious. We have repeatedly held that a promise of future performance, when made with a present intent not to perform and made to induce a party to act in reliance on that promise, constitutes actionable deceit and fraud. *State v. Bruce*, 1 Utah 2d 136, 139, 262 P.2d 960, 962 (1953); *Berkeley Bank for Cooperatives v. Meibos*, 607 P.2d at 801; *Cerritos Trucking Co. v. Utah Venture No. 1*, Utah, 645 P.2d 608, 611 (1982). This principle is a matter of hornbook law. Prosser & Keeton, *Torts* § 109, at 763 (5th ed. 1984). Clearly, the false promise in this case will sustain an action for fraud.[2]

Second, defendants argue that Von Hake's reliance upon Thomas's speculative promises was unreasonable. This argu-

---

**2.** This argument is so devoid of merit that we question whether defendants' counsel has complied with Rule 40 of the Utah Rules of Appellate Procedure. Rule 40(a) states that the signature of an attorney upon a pleading constitutes a certificate by the attorney, *inter alia,* that the pleading is "well grounded in fact and is warranted by existing law. . . ."

ment fails. There is abundant record evidence from which the jury could find that Thomas did everything in his power to induce Von Hake, who was about to lose the ranch he had owned for forty years unless he could get Thomas's promised assistance, to rely on his promises of future performance, to allay any misgivings Von Hake might have had, and to dissuade Von Hake from having his attorney review the matter before the documents were signed. The evidence supporting the jury's finding that Von Hake's reliance was reasonable under these circumstances is sufficient to sustain the verdict as a matter of law. Accordingly, the award of compensatory damages is affirmed.

 Defendants' final claim is that the punitive damages award was based entirely on passion and prejudice. Punitive damages are the exception rather than the rule and should be imposed cautiously. *Behrens v. Raleigh Hills Hospital, Inc.*, Utah, 675 P.2d 1179, 1186 (1983). In this case, the jury was instructed that it could award punitive damages only upon a finding that defendants' conduct was willful and malicious. The jury apparently so found, and the evidence supports that finding. Nothing indicates that as a matter of law this is not an appropriate case for punitive damages under the criteria spelled out in *Behrens. See* 675 P.2d at 1186–87.

To sustain an award of punitive damages, the reviewing court must also be able to deduce that the award of damages is not so grossly excessive that it could only have resulted from passion and prejudice. *First Security Bank v. J.B.J. Feedyards, Inc.*, Utah, 653 P.2d 591, 599 (1982). Defendants have baldly asserted that the jury's award was motivated solely by concern for an elderly neighbor, yet they have pointed out no record evidence indicating that the award was either excessive or a result of passion and prejudice. To the contrary, a review of the evidence refutes their claim.

 Von Hake was unquestionably under pressure when faced with the loss of his ranch. Unable to find help elsewhere, he turned to Thomas, a real estate developer who was well aware of Von Hake's predicament. Thomas ingratiated himself with Von Hake by making false promises designed to secure Von Hake's cooperation and permit him to obtain the ranch at the lowest possible price. As a result, Thomas acquired the million-dollar ranch for approximately ten percent of its conservatively assessed value. The jury's punitive damages award was approximately equal to its compensatory damages award. Together, both awards approximated the amount of Von Hake's original equity in the ranch. Under these circumstances, there is certainly no basis for concluding that the award was so grossly excessive as to have resulted from passion and prejudice.

Defendants also attack the award on the ground that the jury was not instructed to consider all the factors pertinent to a determination of punitive damages, citing *Terry v. Zions Cooperative Mercantile Institution*, Utah, 605 P.2d 314 (1979), *overruled on other grounds, McFarland v. Skaggs Cos.*, Utah, 678 P.2d 298 (1984). In *J.B.J. Feedyards,*[3] we enumerated the factors a jury should consider. They include the following: the amount of actual damages awarded, the nature of the wrongdoer's acts, the facts and circumstances surrounding the wrongful acts, the relative wealth of the wrongdoer, the probability that the wrongdoer might act in the same way in the future, the relationship between the parties, and the effect of the misconduct on the lives of the victim and others. 653 P.2d at 598–99; *accord Cruz v. Montoya*, Utah, 660 P.2d 723, 727 (1983).

Substantial evidence was presented at trial with respect to all but one of the factors noted: the evidence regarding defendants' relative wealth was minimal. The only evidence on this point was that defendant First National Credit Corporation had acquired, for just over $100,000, title to the Seeps Ranch, which had a net

---

**3.** *J.B.J. Feedyards* was decided just after the trial of this case. However, the factors listed were merely codified from a number of earlier cases involving punitive damages awards.

worth of at least $1 million, and that the corporation, through the efforts of Thomas, invested several million dollars in ranch improvements immediately after the acquisition, although the source of these funds was unclear.

Von Hake's proposed jury instruction on punitive damages failed to advise the jury to consider each of the factors noted above. Because of this and the fact that evidence of defendants' net worth was minimal, a remand might be appropriate to reconsider the award in light of such evidence. *See Nelson v. Jacobsen,* Utah, 669 P.2d 1207, 1219–20 (1983); *Bundy v. Century Equipment Co.,* Utah, 692 P.2d 754, 759 (1984). However, defendants made no objection to the proposed instruction prior to its submission to the jury. And defendants' post-trial remittitur argument was limited solely to a claim that the punitive damages award was the result of passion and prejudice. Because the inadequacy of the instruction was never raised before the lower court, we decline to address it for the first time on appeal.

Affirmed.

HALL, C.J., and DURHAM, J., concur.

STEWART, Justice (Concurring and Dissenting):

I concur in the majority opinion except for its affirmance of the punitive damage award of $500,000. Although I agree that the evidence supports *an* award of punitive damages, there is in the evidence no rhyme or reason why it should be $500,000. The amount is wholly capricious and was nothing more or less than the product of passion and prejudice, just as it would have been if it had been fixed at $50,000 or $5,000,000. In my view, the award of punitive damages on an essentially standardless basis is inconsistent with the rule of law.

I recognize that the propriety of the jury instruction on punitive damages is not before the Court, but we have always exercised the power to reduce excessive punitive damages. In my view, the punitive damages should be reduced to one-third the amount of the compensatory damages, or $166,666, the likely amount of plaintiff's attorney fees, a cost he ought not have to bear.

Howe, Justice, concurs in the concurring and dissenting opinion of Justice Stewart.