Floyd WEBSTER, Plaintiff
and Respondent,

v.

Mary LEHMER and Charles Lehmer,
Defendants and Appellants.

No. 19339.

Supreme Court of Utah.

April 8, 1987.

Rehearing Denied Sept. 28, 1987.

Robert S. Campbell, E. Barney Gesas, Salt Lake City, for appellants.

James J. Smedley, Heber City, for respondent.

STEWART, Associate Chief Justice:

Defendant Mary Lehmer appeals the judgment of the district court rescinding a real estate contract executed by Lehmer and her husband as purchasers and plaintiff Floyd Webster as seller.[1] The trial court entered a decree rescinding the contract based on mutual mistake, unilateral

---

1. By the time of trial, Mr. Lehmer had died. Therefore, unless specifically indicated otherwise, any reference to "Lehmer" herein means Mary Lehmer only.

mistake, and undue influence in the abuse of a confidential relationship between the parties. We affirm the finding of undue influence and, therefore, do not reach the other issues.

### I.

In 1948, Webster and his wife obtained by quitclaim deed a house situated on a parcel of property located along what was Heber Avenue and what is now Deer Valley Road in Park City, Utah. Webster lived in the house for nearly thirty-three years and paid the property taxes for nearly that long. Webster treated the parcel of property as his own, but he did not own the underlying fee interest.

Several other persons also occupied land located in the same general area on the same basis. The fee interests to most of these properties, including most of Webster's, were owned by United Park City Mining Company until 1971 when they were purchased by Royal Street Land Company (Royal Street). Some of the fee interests, including a small portion of Webster's parcel, were owned by the Bureau of Land Management (BLM).

Mary Lehmer, an attorney, acquired the right to occupy a parcel of land immediately adjacent to Webster's. The fee to this parcel was owned by Royal Street. Beginning prior to 1972, Mary Lehmer researched the issue of adverse possession to learn what she had to do to obtain clear title to the fee. Armed with this knowledge, and apparently having met the requirements for adverse possession of her parcel, Lehmer, in 1979, threatened Royal Street with a lawsuit to quiet title to the underlying fee to her parcel unless Royal Street would agree to accept $2,000 in exchange for a warranty deed conveying the fee interest to Lehmer. That price amounted to less than ten cents per square foot. Royal Street asked for $10,000 but ultimately accepted Lehmer's offer and transferred clear title to the property for $2,000.

Lehmer testified that she attempted to educate her neighbors concerning their legal rights to the underlying fee interests and that she encouraged them to join together to fight Royal Street. Her neighbors looked to her as an authority on the subject because she was an attorney and had done research on the subject. One neighbor, Neil Clegg, specifically remembered a spontaneous meeting of neighbors at Lehmer's house where Lehmer explained, at the neighbors' request, their rights to the properties. Clegg testified that Webster attended part of that meeting.

During the late 1970s and early 1980s, Royal Street had an unwritten policy of selling to the occupants of the land the fee interests underlying their properties for fifty cents per square foot, apparently because of the potential rights the occupants had as adverse possessors. Several of the occupants took advantage of this policy, purchased the underlying fee interests, and later sold their properties for substantial profits made possible by sharply escalated land values resulting from the development of the Deer Valley ski resort in the area. The evidence at trial showed that the fee interests to some of these lots that were comparable in size to Webster's sold for between $240,000 and $410,000.

Lehmer was aware of the Royal Street policy to sell for fifty cents per square foot. Webster was aware of the Royal Street policy, but he thought his property was owned by the BLM. He thought so because he knew that some of his neighbors occupied BLM land. Webster did nothing to determine conclusively the correct ownership of the underlying fee. Lehmer, however, knew that Webster's lot was owned by Royal Street.

During the years the Websters and the Lehmers were neighbors, they exchanged friendly service for advice. Webster helped the Lehmers with household repairs, for which he was sometimes paid. Lehmer, at times, offered legal advice and assistance. For example, prior to Mrs. Webster's death in 1975, Lehmer helped Mrs. Webster prepare an answer to a complaint that had been filed against Mrs. Webster. Later, a few years after Mrs. Webster died, Floyd Webster asked Lehmer for legal advice concerning his property. Lehmer re-

viewed Webster's documents of title to determine how long he had been on the property for adverse possession purposes and what kind of claim Webster had to the property.

In October of 1980, Webster was unemployed, the water and gas to his house had been cut off, and the property taxes had been in arrears for almost four years. Webster also had a drinking problem, and his driver's license had been revoked because of an arrest on a drunken driving charge. The trial court found that because of these factors and others, Webster had a depressed and despondent state of mind.

While Webster was walking along the road in front of Lehmer's house on October 7, 1980, Lehmer asked Webster in. She and her husband offered to purchase Webster's interest in the property for $5,000 and to let Webster retain a life estate in the house so that he would have a place to live. Webster accepted the offer, and Lehmer immediately drafted a hand-written contract. Webster and Mr. and Mrs. Lehmer signed the contract. The $5,000 purchase price was to be paid in full when Webster tendered to the Lehmers a quitclaim deed. The contract further provided that Lehmer would pay for a survey to obtain a legal description of the property and that Webster would pay the property taxes as long as he occupied the property.

Because of Webster's financial problems, he sought advancements of the purchase price from the Lehmers. The Lehmers willingly advanced $900 in several payments to Webster. On December 21, 1980, Webster visited Lehmer to obtain one of these advances. At that time, Webster planned to get married and move to Heber City. Lehmer suggested that under those circumstances, Webster would no longer need his life estate in the house. He agreed, and Lehmer immediately prepared a hand-written agreement terminating Webster's life estate. This agreement was drafted on the reverse side of the same piece of paper containing the original October 7, 1980, agreement. In return for Webster's relinquishment of his life estate, the Lehmers agreed to pay the unpaid water, sewer, and scavenger charges of $356.20, the 1980 property taxes on Webster's house, and the legal expenses and recording fees necessary to terminate Mrs. Webster's joint tenancy interest in the home. Lehmer also prepared and typed an "Affidavit to Terminate Joint Tenancy." This was signed by Webster and by Lehmer as notary public. The affidavit was intended to document the fact that since Webster had survived his wife, her interest in the house had devolved upon him. A $25 attorney fee for drafting the affidavit was listed in Lehmer's records concerning Webster's property and was among the total fees the trial court found Lehmer had paid in consideration for the termination of Webster's life estate.

It was later determined that the purchase contract was not effective in transferring all Webster's interest in the property to the Lehmers. Lehmer mistakenly read the deed which granted the interest to Webster and his wife as creating a joint tenancy, when in fact it created a tenancy in common. Thus, when Mrs. Webster died intestate in 1975, her interest, instead of passing solely to Mr. Webster, passed by the rules of intestate succession to Webster and Webster's two daughters. Obviously he could not transfer his daughters' interests.

## II.

Before we address the confidential relationship issue, we must dispose of another argument advanced by Lehmer. She argues that the trial court prejudicially erred when it admitted evidence concerning the market value of the undivided fee interest when Webster owned the rights of an adverse possessor and not the undivided fee. Lehmer produced evidence that Webster's interest was worth at most what Lehmer paid Webster for it.

■ Given the totality of the circumstances, however, it was proper for the trial court to consider the value of the undivided fee. Lehmer admitted that she acquired absolute title to her property by threatening Royal Street with an adverse possession lawsuit. She also testified that

she advised other similarly situated occupants of the land in the area concerning their adverse possession claims. She specifically recalled a time after Mrs. Webster died when she looked at Webster's quitclaim deed to see if he had been on the property long enough to advance an adverse possession claim. Webster had lived on the parcel for thirty-three years when he sold his rights to the Lehmers and he had paid the taxes. Therefore, there is a real possibility that, like Lehmer, Webster also had claim to the underlying fee by adverse possession. *See* U.C.A., 1953, §§ 78–12–7 to –15. It is also clear that Lehmer was aware of the potential of Webster's claim. Of course, we express no opinion on what the outcome of an adverse possession claim by Webster would be, but it is clear that Webster's property interest was possibly quite substantial. Lehmer would have obtained whatever adverse possession rights Webster had in the property and thus would have been in a position to force Royal Street's hand once again.

Further, Lehmer was well aware of the Royal Street policy to sell the underlying fee titles to the occupants of the land for fifty cents per square foot. She also knew that Webster's parcel was owned by Royal Street, whereas Webster thought it was owned by the BLM. Lehmer's purchase of Webster's rights thus gave her the chance to purchase the underlying fee from Royal Street for a discount from its market value.

Lehmer purchased Webster's whole bundle of rights, whatever they were, for $5,000, when the trial court found that the underlying fee had a potential value of between $240,000 and $410,000. Thus, under the circumstances, we cannot say that it was error for the trial court to admit evidence of the potential value of the undivided fee.

### III.

■ The most crucial issue in the case is whether the trial court correctly concluded that a confidential relationship existed between Webster and the Lehmers. "A confidential relationship arises when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party." *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985).

> The doctrine of confidential relationship rests upon the principle of inequality between the parties, and implies a position of superiority occupied by one of the parties over the other. Mere confidence in one person by another is not sufficient alone to constitute such a relationship. The confidence must be reposed by one under such circumstances as to create a corresponding duty, either legal or moral, upon the part of the other to observe the confidence, and it must result in a situation where as a matter of fact there is superior influence on one side and dependence on the other.

*Bradbury v. Rasmussen*, 16 Utah 2d 378, 383, 401 P.2d 710, 713 (1965) (footnotes omitted). Whether a confidential relationship exists is a question of fact. *Von Hake*, 705 P.2d at 769; *Blodgett v. Martsch*, 590 P.2d 298, 302 (Utah 1978). However, a confidential relationship is presumed between an attorney and a client. *Baker v. Pattee*, 684 P.2d 632, 636 (Utah 1984).

■ If a confidential relationship is found, "any transaction that benefits the party in whom trust is reposed is presumed to have been unfair and to have resulted from undue influence and fraud." *Von Hake*, 705 P.2d at 769. *See also Cunningham v. Cunningham*, 690 P.2d 549, 553 (Utah 1984); *Bradbury*, 16 Utah 2d at 383 n. 4, 401 P.2d at 713 n. 4. The party in whom trust is reposed must then come forward and prove that the transaction was fair, or it will be undone. *Von Hake*, 705 P.2d at 769; *Cunningham*, 690 P.2d at 553; *Bradbury*, 16 Utah 2d at 383 n. 4, 401 P.2d at 713 n. 4; *In re Swan's Estate*, 4 Utah 2d 277, 293, 293 P.2d 682, 693 (1956). Finally, the findings of the trial court on these specific questions of fact will be given considerable deference and will only be reversed if clearly erroneous. Utah R.Civ.P. 52(a) (as amended effective January 1, 1987); *Ashton v. Ashton*, 733 P.2d 147, 150 (Utah 1987).

■ Ample evidence exists to sustain the finding of the trial court that a confidential relationship existed between Lehmer and Webster. Lehmer argues that she was merely a neighbor and friend to Webster and asserts that that is not enough to support a finding of a confidential relationship. However, it is clear that much more existed between the parties. Lehmer counseled Webster and his wife at least twice, not in the capacity of a neighbor, but in the capacity of an attorney. Further, when Lehmer prepared the contracts involved in this case, she was acting not only as buyer, but was also utilizing her expertise as an attorney. Webster testified that he knew nothing about the legal aspects of the transaction but that he trusted Lehmer because she was an attorney and that he relied upon her expertise. Webster did not believe she would be unfair. Lehmer admitted that Webster had probably viewed her as his attorney when he had previously sought her legal advice. The trial court specifically found that Webster was incapable of understanding the legal impact of the contracts. Consistent with these attorney-client indicia, Lehmer included her attorney fees for drafting the "Affidavit to Terminate Joint Tenancy" as part of the consideration paid for the property.

Lehmer was also well aware of the potential adverse possession claims Webster and all other similarly situated occupants of land had against Royal Street Land Company and was aware, because of the purchase she made of her parcel, that clear title to the underlying fee interest could have been purchased at a substantial discount from its actual market value. Lehmer also knew that Webster's property was owned by Royal Street, whereas Webster thought the BLM owned his property. Further, when the contract was executed, Webster was in dire financial straits and was found by the trial court to be depressed and despondent.

These facts, coupled with the fact that Lehmer purchased Webster's rights for $5,000, which she knew could have easily blossomed into $240,000 to $410,000, support the trial court's finding of a confidential relationship and suggest strongly that the parties were on unequal ground and that Lehmer had a position of dominance over Webster.

Accordingly, a presumption of undue influence was established, and the burden shifted to Lehmer to prove that the transaction was fair. Lehmer has failed to carry that burden. Her evidence that Webster's rights were worth less than or about what she had paid for them was argued below and rejected, and we refuse to invade the trial court's right to find the facts when they are in conflict.

Affirmed. Costs to respondent.

HALL, C.J., HOWE, J., and CULLEN Y. CHRISTENSEN, District Judge, concur.

DURHAM, Justice: (concurring in the result).

I concur in the result reached by the majority, but only because of the evidence that an attorney-client relationship existed between Lehmer and Webster. Although we will not overturn a trial judge's finding of fact under Utah Rule of Civil Procedure 52(a) unless we conclude that it is "clearly erroneous," the facts here present a very close case as to whether a confidential relationship existed between Webster and Mrs. Lehmer. As we said in *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985):

> The law presumes that one ordinarily makes his or her own judgments, however imperfect, and acts on them; it does not readily assume that one's will has been overborne by another. Therefore, the law does not lightly recognize the existence of a confidential relationship.

In *Von Hake*, we found that the evidence was insufficient to support the jury's finding that a confidential relationship existed between Von Hake and one Thomas, despite the fact that Thomas had clearly induced Von Hake, an aged man under great financial pressure, to believe that Thomas was only interested in "saving" Von Hake's ranch, when in fact quite the contrary was true. In the present case, Lehmer's dealing with Webster over the actual sale is in many ways analogous to that of

Thomas toward Von Hake, although Lehmer's conduct does not rise to the level of actual fraud, as did Thomas's.

On the other hand, in finding that a confidential relationship was not established in *Von Hake,* we specifically noted that there had been no proof of a "long-established relationship of trust" between Von Hake and Thomas that preceded their dealings. Thomas's relationship to Von Hake was not "one that traditionally imposes a fiduciary duty, such as an attorney/client relationship." 705 P.2d at 770. In my view, the trial court's finding that a confidential relationship existed between Lehmer and Webster can be affirmed only because there is evidence that would support a finding that Lehmer acted as Webster's attorney in this transaction. *See In re Swan's Estate,* 4 Utah 2d 277, 293 P.2d 682 (1956). Absent that relationship, a trial court finding of a confidential relationship could not be sustained merely upon evidence that the two parties lived near each other, had a neighborly relationship, and one of them, at least in the eyes of the other, had a certain measure of expertise. These facts, standing alone, show nothing more than the unequal bargaining positions which are common in any contractual relationship and for which the law does not give a remedy. Given the drastic consequences a finding of a confidential relationship has for the parties to a contract, we should be very careful in defining the circumstances under which such a relationship can be found to exist.

ZIMMERMAN, J., having disqualified himself, does not participate herein; CHRISTENSEN, District Judge, sat.